IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

VICTORIA ROSE DRESSEL,
*Plaintiff*,

v.                                          Civil Action No. ELH-19-1556

SAFEWAY, INC.,
*Defendants*.

**MEMORANDUM OPINION**

In this employment discrimination action, plaintiff Victoria Dressel filed suit against her former employer, Safeway, Inc. ("Safeway"), which operates a chain of supermarkets.  Ms. Dressel alleges that Safeway failed to provide her with a reasonable accommodation for a physical disability, in violation of the Americans with Disabilities Act of 1990 (the "ADA"), as amended, 42 U.S.C. § 12101 *et seq*.  ECF 1 (the "Complaint").  The alleged disability resulted from a car accident that occurred in February 2016, which left Ms. Dressel with knee injuries that impaired her ability to perform her job responsibilities in the deli department at a Safeway store.[1]

Safeway has filed a post-discovery motion for summary judgment (ECF 45), supported by a memorandum of law.  ECF 45-1 (collectively, the "Motion").  Plaintiff opposes the Motion (ECF 50), supported by a memorandum of law.  ECF 53.  Safeway replied.  ECF 55.  Both sides have also submitted exhibits.

No hearing is necessary to resolve the Motion.  *See* Local Rule 105.6.  For the reasons that follow, I conclude that the submissions reveal genuine issues of material fact that preclude the entry of summary judgment.  Therefore, I shall deny the Motion.

---

[1] Plaintiff was self-represented at the time she filed suit in May 2019.  She retained counsel about four months later.

## I. Background[2]

In 2007, Ms. Dressel, then a teenager, began part-time employment at a Safeway store in Towson, Maryland as a "Starbuck's Barista."  ECF 50-2 (Declaration of Dressel), ¶ 2; *see* ECF 45-4 (Dressel Dep.) at 8-9, 14 (Tr. at 11-12, 27).[3]  She continued working at the Towson store part-time while attending college, from which she graduated in 2014.  *See* ECF 50-2, ¶ 2; ECF 45-4 at 8-9, 14 (Tr. at 11-12, 27).  In February 2016, she was working as a service clerk in the deli department of the Towson store, where her primary responsibilities involved making sandwiches. *Id.* at 13 (Tr. at 26).

On February 17, 2016, Ms. Dressel was injured in a car accident.  ECF 50-2, ¶ 4.  In the immediate aftermath of the accident, she received treatment from a MedStar urgent healthcare provider.  ECF 46-1 at 2.  Plaintiff's medical records from that visit reflect that she sustained a contusion to both knees.  *Id.*  Plaintiff returned to work some days later, although her knees "were really hurting" her.  ECF 45-4 at 10 (Tr. at 16); *see* ECF 50-2, ¶ 4.  A few weeks later, plaintiff was assigned a new role in the deli department and tasked with "preparing rotisserie chickens" and attending to the "hot bar."  ECF 50-2, ¶ 5.  This role required lifting fifty-plus pounds on a regular basis.  *Id.*

In her Declaration, Ms. Dressel avers that in early May 2016, she "tried to speak with Brian Cottel, about moving to a less demanding job on account of increasing pain in [her] knees," but was advised that Cottel was "too busy."  ECF 50-2, ¶ 7.  Plaintiff also avers that around the same

---

[2] The facts are taken from the parties' exhibits, viewed in the light most favorable to plaintiff, the nonmoving party.  Some of plaintiff's exhibits arguably contain inadmissible hearsay. But, defendant has not lodged any challenges.

[3] I cite to the electronic pagination, which does not always correspond to the page number that appears on the particular submission.

time, she informed her supervisor, Charles Fowlkes, Jr., that her knee injury "made it difficult to perform the Deli Clerk position." *Id.* ¶ 8. Nothing else in the parties' submissions references "Brian Cottel" or either of these alleged interactions.

On May 8, 2016, Ms. Dressel was seen at "Patient First," a healthcare provider in Baltimore. *Id.* ¶ 9. She obtained a note excusing her from work for ten days and recommending various light duty work restrictions, including "no bending with lifting more than 10 lbs, no squatting." ECF 50-12.

According to plaintiff, the following day she gave Mr. Fowlkes the doctor's note and was told that she "could not work with the light duty restrictions." ECF 50-2, ¶ 10. Although the submissions are fuzzy on this point, plaintiff indicates that she did not return to work at Safeway as of that date. *See* ECF 53 at 7. Defendant does not suggest otherwise in its reply.

Dressel visited her "regular doctor," Dr. Shalini Karmal, on May 12, 2016. ECF 45-4 at 26 (Tr. at 48); *see* ECF 46-3 at 3 (medical record). According to the medical record of that visit, Dr. Karmal diagnosed plaintiff with bilateral knee pain, and indicated that she "probably has sprained her knee and may have some chondromalacia." ECF 46-3 at 5.[4] Dr. Karmal recommended physical therapy and an over-the-counter pain reliever twice a day, as needed. *Id.* And, Dr. Karmal gave plaintiff a "slip to be on light duty" for six weeks and "to avoid lifting anything over 10 pounds for that duration of time." *Id.*

Plaintiff avers that on June 6, 2016, she spoke with Jessica Page, a human resources manager for Safeway, "about the process for obtaining a disability accommodation," and requested

---

[4] "Chondromalacia patella (knee pain) is the softening and breakdown of the tissue (cartilage) on the underside of the kneecap (patella)." *Knee Pain (Chondromalacia Patella)*, Cleveland Clinic, https://my.clevelandclinic.org/health/diseases/15607-knee-pain-chondromalacia-patella (last visited May 12, 2021). Adjudicative facts such as this may be judicially noticed, pursuant to Fed. R. Civ. P. 201.

to be transferred to a new position.  ECF 50-2, ¶ 13.  In particular, plaintiff indicated an interest in a "GMHBC" position, a barista position, and a "Hand Scanner" position.  *Id.*; *see* ECF 50-4 (Jessica Page Dep.) at 4 (Tr. at 18-19).   Defendant defines "GMHBC" as "General Merchandise/Health and Beauty Clerk."  ECF 45-1 at 8.  The submissions do not otherwise explain the reference to "Hand Scanner."

Plaintiff avers that Ms. Page never called her back.  ECF 50-2, ¶ 13. The exhibits suggest that Ms. Page likely had a heavy workload.  She was responsible for human resources issues related to the ADA for fifty-four to sixty-six Safeway stores, and she did not have any subordinates assisting her.  *Id.*  ECF 50-4 at 5 (Tr. at 22-23).  However, nothing else in the submissions indicates that plaintiff spoke to Ms. Page about requesting reasonable accommodation in early June 2016. Moreover, plaintiff and Ms. Page had several subsequent exchanges, as discussed, *infra*.

On June 21, 2016, plaintiff was seen by Dr. David Gold of MedStar Orthopaedics.  ECF 46-5 at 6 (medical record); *see* ECF 45-4 (Dressel Dep.) at 29-30 (Tr. at 53, 59).[5]  Dr. Gold gave plaintiff a doctor's note indicating that she was able to return to work but was advised against "repetitive bending or squatting" and lifting more than ten pounds.  ECF 46-5 at 6.  Plaintiff faxed this note to Ms. Page and her store manager.  ECF 46-5 at 7-10.

A month later, Ms. Page sent plaintiff a letter dated July 19, 2016, regarding the accommodations process.  ECF 50-5.  The letter outlined the process for determining whether plaintiff was entitled to "a job accommodation."  *Id.*  First, plaintiff had to return a form to Ms. Page authorizing Safeway to contact plaintiff's treating physicians.  *Id.*  Then, Safeway would contact the physicians to ask "for a written evaluation of [her] condition and ability to perform

---

[5] ECF 45-4 primarily contains the transcript of plaintiff's deposition.  But, it also includes various exhibits marked for identification during the deposition.

[her] duties as a Service Clerk/Deli." *Id.* In addition, the letter indicated that a "job analysis" for the GMHBC position would also be provided to the physicians, because plaintiff had expressed interest in it. *Id.* After receiving the necessary evaluations from the physicians, plaintiff's case would be reviewed by the Accommodation Committee. *Id.*

Plaintiff saw Dr. Gold for a follow-up appointment on August 12, 2016. Dr. Gold informed her that she could return to work without any restrictions. ECF 45-4 at 32 (Tr. at 61). However, Dressel sought a second opinion. *Id.* at 33-34 (Tr. at 63-64).

Two weeks later, on August 25, 2016, plaintiff underwent an initial evaluation by Dr. Jonathan Dunn, an orthopedic surgeon who practices at Multi-Specialty Health Care in Baltimore. *Id.* at 37 (Tr. at 69); ECF 51 (Declaration of Dr. Dunn) at 2. The medical record from that evaluation reflects Dr. Dunn's initial opinion that plaintiff was "capable of lifting 10-20 pounds, but should not perform any squatting or kneeling." ECF 51 at 6. And, Dr. Dunn recommended that plaintiff avoid "deep knee bends." *Id.*

Plaintiff returned for a follow-up appointment on September 15, 2016. She was evaluated by a physician's assistant, Dan Schechter, rather than Dr. Dunn. *Id.* at 8-9. She informed Schechter that she wanted to return to work in a position that did not require squatting or lifting more than twenty pounds at a time. *See* ECF 45-4 at 40-41 (Tr. at 73-74). An MRI of plaintiff's knee revealed edema but no "internal derangement" or "surgical indications." ECF 51 at 8. Schechter provided plaintiff with a "Disability Form" that recommended no lifting of more than twenty pounds, "repetative [sic] squatting," and "ladder climbing." ECF 50-17.

According to plaintiff's Declaration, Ms. Page informed plaintiff that on September 21, 2016, she received the medical authorization form as to Dr. Dunn. ECF 50-2, ¶ 23. A few weeks later, Ms. Page sent Dr. Dunn the questionnaire regarding plaintiff's condition. *Id.* No other

evidence in the exhibits, however, indicates that Ms. Page informed plaintiff or otherwise sent the paperwork to Dr. Dunn at that time.

Ms. Page sent Dr. Gold—the first orthopedist—the pertinent questionnaire around October 14, 2016. ECF 45-4 at 78. Dr. Gold completed the form, describing plaintiff's prognosis as "good," stating "she has been released from our care," and indicating that plaintiff was not subject to any work restrictions. *Id.* at 78-79.

Plaintiff avers that she spoke with Ms. Page on November 9, 2016, and learned that Ms. Page received the questionnaire from Dr. Gold around that date. ECF 50-2, ¶ 24. Thereafter, plaintiff did not receive any information about the status of her accommodation request for over two months. *Id.* ¶ 25. On January 18, 2017, plaintiff faxed Ms. Page a copy of the note provided by Schechter on September 15, 2016. *Id.* ¶ 26. That day, apparently in response to the fax, Ms. Page called plaintiff. *Id.* ¶ 27. According to plaintiff, Ms. Page was under the impression that plaintiff had returned to work, per Dr. Gold's approval. *Id.* ¶ 27. Plaintiff avers that, in effect, she told Ms. Page that the opinion of Dr. Dunn and Schechter should be considered the basis for a request for reasonable accommodation. *See id.* Plaintiff then faxed the necessary authorization form to Ms. Page. *Id.*

Ms. Page sent Dr. Dunn a questionnaire regarding plaintiff's condition, dated January 23, 2017. ECF 45-4 at 71. Official job descriptions of three Safeway positions were also included: deli clerk; barista; and GMHBC.[6] Each job description indicated the frequency with which an employee would have to engage in various tasks and physical movements or activities. In all of

---

[6] The details on this point are unclear, but it seems that Ms. Page and/or the Accommodations Committee was considering potential reasonable accommodations that could be implemented with respect to plaintiff's position in the deli department, or by way of a transfer to another position.

the job descriptions, these frequencies were selected from a predefined set of options: "Never (0% of [the] time)"; "Seldom (1-10% [of the time])"; "Occasional (10-30% of the time)"; "Frequent (30-70% [of the time])"; "Constant (over 70% of the time)."  ECF 45-3 at 11, 19, 24.

Of pertinence here, the job descriptions indicated the following requirements for the deli service clerk, barista, and GMHBC positions, respectively, *see id.*:

| Position | Lift 11-20 pounds | Lift 21-35 pounds | Climb ladder | "Bend / Stoop (waist)" | Crouch | Kneel | Squat |
|----------|-------------------|-------------------|--------------|------------------------|--------|-------|-------|
| Deli clerk | Constant | Frequent | Seldom | Seldom | Frequent | Never | Seldom |
| Barista | Frequent | Seldom | Seldom | Frequent | Seldom | Never | Occasional |
| GMHBC | Frequent | Occasional | Frequent | Frequent | Frequent | Frequent | Frequent |

Dr. Dunn completed and signed the questionnaire on February 23, 2017.  *Id.* at 71-72.  In response to the question, "Please indicate the duration of time, if any, Ms. Dressel is able to bend and squat for each job description," Dr. Dunn wrote by hand "none."  *Id.* at 71.  And, in response to the question asking for a list of "any task which Ms. Dressel can NOT perform for each job description and why," Dr. Dunn wrote by hand: "Lifting > 20 lbs., ladder, squatting."  *Id.* at 72. He also indicated that the restriction on bending and squatting was to last for one year.  On March 10, 2017, Ms. Page emailed plaintiff to inform her that the paperwork from Dr. Dunn was received the previous day.  ECF 50-19 at 2.

Around that time, on March 7, 2017, plaintiff submitted an intake questionnaire to the U.S. Equal Employment Opportunity Commission ("EEOC").  ECF 1-2 at 24-27.  In response to the question, "What happened to you that you believe was discriminatory?" plaintiff wrote: "I was never accommodated for a doctor-excused, light duty position due to a car accident.  It has taken too long."  *Id.* at 25.  As described, *infra*, the EEOC later attempted to facilitate an informal

conciliation process between the parties.  ECF 1-4.  But, neither side clearly recounts the facts of the EEOC's involvement.

Ms. Page called plaintiff on March 21, 2017, and offered her a transfer to a barista position as a reasonable accommodation.  *See* ECF 45-1 at 12; ECF 50-2, ¶ 32.  But, there is no documentation of a written offer.  In particular, plaintiff asserts that Ms. Page informed her "that the Job Accommodation Committee chose the Starbucks position for [her]."  ECF 50-2, ¶ 32; *see also* ECF 45-4 at 73 (April 3, 2017 email from plaintiff to Ms. Page, referencing the job offer made orally on March 21, 2017).

It is not clear whether Ms. Page offered any explanation of why plaintiff was offered the barista position as a reasonable accommodation.  Moreover, Ms. Page indicated at her deposition that the GMHBC position had been considered as a possible reasonable accommodation for plaintiff around that time.  ECF 50-4 at 6 (Tr at 48-49).  Ms. Page testified that certain requirements of the GMHBC position that plaintiff would not have been able to perform, such as lifting heavy objects, could have been "waiv[ed]."  *Id.* at 6 (Tr. at 49).  But, Ms. Page never communicated in writing to plaintiff that a transfer to the GMHBC position, with certain job requirements waived, was considered by the Accommodations Committee as a potential reasonable accommodation.  *Id.* at 7 (Tr. at 50).  Nor did Ms. Page remember ever orally communicating that information to plaintiff.  *See id.*

Plaintiff rejected the offer of the barista position, even though she had previously expressed interest in it.  *See* ECF 50-4 (Page Dep.) at 4 (Tr. at 18-19).  Plaintiff asserted that the demands of the job exceeded her physical capabilities and were "opposed to what [her] doctors prescribed."  ECF 45-4 at 73.  A few weeks later, on April 3, 2017, plaintiff emailed Ms. Page and asked that

she be considered "for other positions that better match what [she was] able to do physically," namely, "File Maintenance and Pharmacy Tech." *Id.*

On April 4, 2017, Ms. Page sent plaintiff the job description of the pharmacy technician position. ECF 45-4 at 74. The job description for that position indicated the following requirements, ECF 45-3 at 31-34:[7]

| Lift 11-20 pounds | Lift 21-35 pounds | Climb ladder | "Bend/Stoop (waist)" | Crouch | Kneel | Squat |
|---|---|---|---|---|---|---|
| Occasional | Seldom | Seldom | Occasional/ Frequent | Seldom | Seldom/ Occasional | Seldom/Occasional |

According to plaintiff, she spoke with Ms. Page on the phone that day, and learned that "in order to be considered for the Pharmacy Tech position, Dr. Dunn would have to change his responses" regarding the restrictions on bending and squatting. ECF 50-2, ¶ 35. Defendant does not address whether Ms. Page made such a statement.

On May 15, 2017, plaintiff emailed the paperwork to Ms. Page, purportedly completed by Dr. Dunn, regarding the pharmacy technician position. ECF 45-4 at 75. That paperwork was almost an identical copy of the questionnaire completed by Dr. Dunn a few months earlier. In particular, the last date of examination (September 15, 2016), signature, and signature date remained unchanged. *See id.* at 76-77. However, below the question regarding "the duration of time, if any, Ms. Dressel is able to bend and squat for each job description," the handwritten word "occasional" was added next to the word "none." *Id.* And, below the question asking to list "any task which Ms. Dressel can NOT perform for each job description and why," the handwritten word "repetitive" was added below "Lifting > 20 lbs., ladder, squatting." *Id.* at 77.

---

[7]  The designations for bending, kneeling, and squatting, respectively, are ambiguous, because the job description for each task contains two descriptors of the frequency of the task, as reflected in the table set forth in the text above. ECF 45-3 at 33. Neither side acknowledges or explains these ambiguities.

Defendant suggests concern about the authenticity of this form.  *See* ECF 45-1 at 13.  Dr. Dunn testified at his deposition that he did not recall meeting with plaintiff in the spring of 2017 and that the words "occasional" and "repetitive" were not his handwriting.  *See* ECF 45-6 (Dunn Dep.) at 3 (Tr. at 25).  Moreover, the Declaration of Dr. Dunn, which was submitted by plaintiff, attests to the authenticity of various medical records generated by his office pertaining to plaintiff, but makes no mention of the disability questionnaire supposedly completed in the spring of 2017. *See* ECF 51 at 2-3.

It is unclear what, if any, developments took place during the five months that followed. Plaintiff avers that on July 11, 2017, Ms. Page told plaintiff "to call different stores to see if they had any available Pharmacy Technician positions," and "said she would do the same."  ECF 50-2, ¶ 40.  In any event, both sides seem to agree that Ms. Page never formally extended an offer to Dressel for a transfer to the Pharmacy Technician position.

Dr. Dunn saw plaintiff for a follow-up appointment on October 5, 2017.  ECF 51 at 3.  The medical record from that appointment reflects that Dr. Dunn noted that plaintiff's ongoing knee pain would "likely remain permanent."  *Id.* at 13.  It adds: "Permanent work restrictions, including no repetitive squatting, ladder climbing, and no lifting more than 20 pounds at this time are appropriate."  *Id.* at 14.  Plaintiff left that appointment with a "Disability Form" that indicates that as of that date, plaintiff could perform light duty work, with no lifting over twenty pounds and no "repetitious squatting or ladder climbing."  *Id.* at 16.

On December 4, 2017, Ms. Page sent a letter to plaintiff offering her a leave of absence as a reasonable accommodation.   ECF 50-24.  Of course, by that point plaintiff had not actually worked a shift at Safeway in a year and a half.  Nor has she done so since.  A letter subsequently

sent to plaintiff indicated that her employment was formally terminated on September 21, 2018. ECF 50-11.

On September 10, 2018, the EEOC issued a "Determination" concerning plaintiff's charge against Safeway, stating that there was "reasonable cause to believe that [Safeway] violated the ADA by failing to reasonably accommodate [plaintiff] (including reassignment) and placing her on a leave of absence because of her disability." ECF 1-4 at 1. Accordingly, the EEOC "invite[d] the parties" to reach a resolution through a process of "conciliation." *Id.* at 2.

Thereafter, an EEOC attorney, Maria Salacuse, sent Dr. Dunn's office the job description for the pharmacy technician position. ECF 45-5 at 14. Dr. Dunn completed a form indicating that plaintiff could "perform [the] job as described," and that she was able to do so as of October 5, 2017. *Id.* at 31.

It is undisputed that sometime in November 2018, Safeway offered plaintiff the pharmacy technician position. *See* ECF 45-1 at 15; ECF 53 at 13. Ms. Page subsequently sent plaintiff a follow-up letter requesting a response to the offer. ECF 45-4 at 84. Plaintiff did not accept the offer, however. At plaintiff's deposition, she was asked why she did not accept the offer. She responded: "I would have taken it, but I think that it wasn't just done in a timely manner." *Id.* at 56 (Tr. at 123). And, she elaborated: "I was fired from Safeway and I felt why should I take something from a place that's firing me for no reason right now, so that's just how I was feeling at the time." *Id.* at 57 (Tr. at 124).

On February 21, 2019, the EEOC issued a "Notice of Failure to Conciliate," accompanied by a "Notice of Right to Sue" addressed to plaintiff. ECF 1-3. This suit followed.

## II.  Legal Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see also, e.g.*, *Cybernet, LLC v. David*, 954 F.3d 162, 168 (4th Cir. 2020).  To avoid summary judgment, the nonmoving party must demonstrate that there is a genuine dispute of material fact so as to preclude the award of summary judgment as a matter of law.  *Ricci v. DeStefano*, 557 U.S. 557, 585-86 (2009); *see also, e.g.*, *Gordon v. CIGNA Corp.*, 890 F.3d 463, 470 (4th Cir. 2018).

The Supreme Court has clarified that not every factual dispute will defeat a summary judgment motion.  "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248.

There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 658 (4th Cir. 2020).  On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252.  But, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514,

522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004); *see Celotex*, 477 U.S. at 322-24.   And, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *Ricci*, 557 U.S. at 585-86; *accord Hannah P. v. Coats*, 916 F.3d 327, 336 (4th Cir. 2019).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016).   Thus, in considering a summary judgment motion, the court may not make credibility determinations. *Wilson v. Prince George's Cty.*, 893 F.3d 213, 218-19 (4th Cir. 2018).   Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility.   *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).

That said, "a party's 'self-serving opinion . . . cannot, absent objective corroboration, defeat summary judgment.'"   *CTB, Inc.*, 954 F.3d at 658-59 (citation omitted).   In other words, "[u]nsupported speculation is not sufficient to defeat a summary judgment motion." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987); *see Harris v. Home Sales Co.*, 499 F. App'x 285, 294 (4th Cir. 2012).

## III.   Discussion

### A.

The ADA, 42 U.S.C. §§ 12101 *et seq.*, was enacted "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities," 42 U.S.C. § 12101(b)(1), and "to provide clear, strong, consistent, enforceable standards

addressing discrimination against individuals with disabilities." *Id.* § 12101(b)(2).  To that end, the statute "prohibits discrimination against persons with disabilities in three major areas of public life," namely, employment, public services, and public accommodations.  *A Helping Hand, LLC v. Baltimore County, Md.*, 515 F.3d 356, 361 (4th Cir. 2008).[8]

Of relevance here, Title I of the ADA concerns employment.  It prohibits employment discrimination "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

A "qualified individual" is defined in the ADA as a person who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).  A disability is defined as: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment[.]"  *Id.* § 12102(1); *see Gentry v. E. W. Partners Club Mgmt. Co*., 816 F.3d 228, 239 (4th Cir. 2016) (quoting 29 C.F.R. § 1630.2(k)(1)).  Major life activities include, but are not limited to, "sleeping, walking, standing, lifting, bending . . . working" and "reproductive functions"  42 U.S.C. §12102(2)(A)-(B).

An individual with a "a record of such an impairment," or who is "regarded as having such an impairment," is considered to have a disability.  *Id.* § 12102(1)(B)-(C).  A plaintiff has a "record

---

[8] The ADA incorporates the administrative exhaustion requirement found in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.  See Sydnor v. Fairfax Cnty.*, 681 F.3d 591, 593 (4th Cir. 2012).  The requirement that a Title VII plaintiff exhaust her administrative remedies is "an integral part" of the enforcement scheme that Congress established in Title VII.  *See Chacko v. Patuxent Inst.,* 429 F.3d 505, 510 (4th Cir. 2005).  By incorporation, it is also integral to the ADA.  *See Sydnor*, 681 F.3d at 593.  It is clear that plaintiff exhausted her administrative remedies.

of disability" if she can show that she "'has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." *Foore v. Richmond*, 6 F. App'x 148, 153 (4th Cir. 2001) (quoting 29 C.F.R. § 1630.2(k)(1)).  This is "'a question of law for the court.'"  *Coghill v. Bd. of Educ. of Prince George's Cty.*, GJH-14-2767, 2017 WL 1049470, at *5 (D. Md. Mar. 17, 2017) (citation omitted), *aff'd,* 703 F. App'x 211 (4th Cir. 2017).  To resolve this question, the court must make an "an individualized inquiry, particular to the facts of each case." *E.E.O.C. v. Sara Lee Corp.*, 237 F.3d 349, 352 (4th Cir. 2001).  The "date of an adverse employment decision is the relevant date for determining whether a plaintiff is a 'qualified individual with a disability.'"  *E.E.O.C. v. Stowe-Pharr Mills, Inc.*, 216 F.3d 373, 379 (4th Cir. 2000).

Of pertinence here, the failure reasonably to accommodate "the known physical or mental limitations of an otherwise qualified individual with a disability" constitutes discrimination under Title I of the ADA.  42 U.S.C. § 12112(b)(5)(A); *see Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 344 (4th Cir. 2013).  A reasonable accommodation either (1) enables a qualified individual with a disability to perform the essential functions of a position, 29 C.F.R. § 1630.2(o)(1)(ii), or (2) enables an employee with a disability to "enjoy equal benefits and privileges of employment as are enjoyed by . . . other similarly situated employees without disabilities." *Id.* § 1630.2(o)(1)(iii); *see Hamel v. Bd. of Educ. of Harford Cty.*, JKB-16-2876, 2018 WL 1453335, at *10 (D. Md. Mar. 23, 2018).  It may include "job restructuring, part-time or modified work schedules, reassignment to a vacant position," and leave, among other things.  42 U.S.C. § 12111(9); *see* 29 C.F.R. pt. 1630 app. § 1630.2(o).

However, an accommodation is not reasonable as a matter of law if it will cause the employer "'undue hardship in the particular circumstances.'"  *Reyazuddin v. Montgomery Cty.*,

789 F.3d 407, 414 (4th Cir. 2015) (quoting *U.S. Airways v. Barnett,* 535 U.S. 391, 401–02 (2002)). At "the summary judgment stage, the employee 'need only show that an "accommodation" seems reasonable on its face,' and then the employer 'must show special (typically case-specific) circumstances that demonstrate undue hardship.'" *Reyazuddin*, 789 F.3d at 414 (quoting *Barnett,* 535 U.S. at 401–02).

In order to establish a prima facie claim of failure to accommodate, plaintiff must show: (1) that she had a disability; (2) that her employer had notice of her disability; (3) that she was a qualified individual under the ADA—that is, that she could perform the essential functions of the position with reasonable accommodation; and (4) that her employer did not provide such accommodation. *See Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 579 (4th Cir. 2015). As a necessary corollary of the fourth requirement, the plaintiff must have communicated to her employer "a wish for accommodation of her disability." *Parkinson v. Anne Arundel Medical Ctr.*, 79 F. App'x 602, 604 (4th Cir. 2003).

The applicable federal regulations provide that to "determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate an informal, interactive process . . . ." 29 C.F.R. § 1630.2(o)(3). The so-called "interactive process" should "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." *Id.*; *see also Haneke v. Mid-Atl. Capital Mgmt.*, 131 F. App'x 399, 399-400 (4th Cir. 2005) (characterizing the interactive process as an "implicit . . . requirement" of the fourth element of the prima facie case).

The responsibility to engage in the interactive process is "*shared* between the employee and the employer." *Loulseged v. Akzo Nobel, Inc.*, 178 F.3d 731, 736 (5th Cir. 1991) (emphasis in *Loulseged*). "A party that obstructs or delays the interactive process, or simply fails to

communicate, is not acting in good faith to find a solution." *Fleetwood v. Harford Systems, Inc.*, 380 F. Supp. 2d 688, 701 (D. Md. 2005).  Moreover, "the employer must work with the employee to determine what accommodation would help," and the employer "cannot escape liability simply because the employee does not suggest a particular reasonable accommodation that would assist him."  *Id.*  In the same vein, the employee "cannot prevail simply by demonstrating that his employer failed to engage in the interactive process; he must also show that this failure to engage in the process resulted in the failure to find an appropriate accommodation." *Id.*

## B.

Safeway does not contest that plaintiff had a record of a disability.  To the contrary, the Motion is premised on the notion that plaintiff's knee condition constituted a disability under the statute.  *See* ECF 45-1 at 20-23.  The gist of the Motion is that from the summer of 2016, when the interactive process commenced, until the fall of 2018, when Dr. Dunn indicated that plaintiff was fit to perform the pharmacy technician position, plaintiff was not a *qualified* individual with a disability, within the meaning of the ADA.

In Safeway's view, the medical information that it received during the relevant period indicated that plaintiff's disability rendered her unable to perform the essential functions of a deli clerk, barista, GMHBC, and pharmacy technician, with or without reasonable accommodation. *See id.*  Moreover, Safeway points out that the ADA does not require an employer to eliminate essential job functions.  *See id.*  Therefore, Safeway contends that plaintiff was not a qualified individual under 42 U.S.C. § 12111(8); *see Jacobs*, 780 F.3d at 579.

As for plaintiff's rejection of the pharmacy technician offer in the fall of 2018, Safeway maintains that she "bears sole responsibility for any resulting loss of income since that date."  ECF 45-1 at 26 (citing, *inter alia*, *Brady v. Thurston Motor Lines, Inc.*, 753 F.2d 1269, 1273 (4th Cir.

1985)).  In other words, Safeway seems to argue that plaintiff does not have a claim as to the period following her rejection of the pharmacy technician offer in November 2018.  Plaintiff does not suggest otherwise.  As a result, she has waived any opposition to this argument.  *See Stenlund v. Marriot Int'l, Inc.*, 172 F. Supp. 3d 874, 887 (D. Md. 2016) ("In failing to respond to [defendant's] argument, Plaintiff concedes the point.");  *Ferdinand-Davenport v. Children's Guild*, 742 F. Supp. 2d 772, 777 (D. Md. 2010) (same).  Even if plaintiff had opposed Safeway's argument, case law instructs that refusal of reasonable accommodation renders a plaintiff ineligible for relief under the ADA.  *See Crocker v. Runyon*, 207 F.3d 314, 320 (6th Cir. 2000) (stating that a plaintiff "is not an otherwise qualified individual once he rejects an offer of reasonable accommodation");  *Roberts v. Cty. of Fairfax, Va.*, 937 F. Supp. 541, 547 (E.D. Va. 1996) ("Inherent in the definition of a 'qualified individual' under the ADA is a significant limitation: the individual must be willing to accept his employer's efforts at reasonable accommodation if the accommodation is necessary for the individual to perform his job.").  Therefore, I agree with defendant that plaintiff cannot prevail, at least as to the period beginning in November 2018.

Notably, Safeway does not take issue with plaintiff's refusal of the offer of the barista position in March 2017.  That is, it does not make the case that plaintiff was not a qualified individual from that point forward because of the refusal.  Rather, Safeway's theory is that plaintiff was not a qualified individual until the fall of 2018, because the medical evaluations by Dr. Dunn indicated that plaintiff could not perform the essential duties of the deli clerk, barista, GMHBC, and pharmacy technician positions, with or without reasonable accommodation.

In addition, Safeway argues that it was not obligated to consider transferring plaintiff to the file maintenance position because it would have constituted a promotion under the pertinent collective bargaining agreement.  *See* ECF 45-1 at 24-25 (citing, *inter alia*, *Barnett*, 535 U.S. at

18

403, for the proposition that the ADA does not require reasonable accommodation in the form of transfers that "trump the rules of a seniority system"). This, too, plaintiff does not address. Thus, she waives argument as to this issue.

In her opposition, plaintiff contends that she was a qualified individual with a disability capable of performing the functions of the pharmacy technician position. ECF 53 at 19. Specifically, she asserts that "if Ms. Page had done her job . . . Plaintiff could . . . have been placed in the Pharmacy Tech position after September 15, 2016." *Id.* at 20. Dressel seems to overlook that she did not express an interest in that position until April 3, 2017, and that Ms. Page received Dr. Dunn's evaluation of plaintiff's fitness to perform that position's essential functions even later. But, construing the argument liberally, I take plaintiff to claim that she should have been offered the pharmacy technician position sometime during 2017, well before Dr. Dunn expressly cleared her to perform the requisite duties in the fall of 2018. *See* ECF 45-5 at 14.

As noted, the job description for the pharmacy position designates the frequency of squatting while performing job functions as both "seldom" (defined as 0-10% of the time) and "occasional" (defined as 10-30% of the time). ECF 45-3 at 31-34. The frequency of bending or stooping at the waist is designated as "occasional" or "frequent" (defined as 30-70% of the time). Thus, the pharmacy technician job description is ambiguous on its face. Both sides appear to assume that squatting is an essential function of the pharmacy technician position. *See* ECF 53 at 19-23; 55 at 5-8. But, neither side offers explanation of the job description or attempts to illustrate how squatting, bending, or stooping at the waist figured in the daily duties of a Safeway pharmacy technician.

To be sure, squatting for eighteen minutes out of every hour (amounting to 30% of the time) is qualitatively different from squatting for just a few minutes (which would approach 0%

19

of the time)—especially to someone with significant, persistent knee pain.  The same is true of bending or stooping for over forty minutes out of every hour, as opposed to ten minutes or less. On this record, it is difficult to say what the requirements were for the pharmacy technician job. Consequently, I cannot determine whether plaintiff was capable of performing them.

Safeway discusses the job requirements of the relevant positions as though they were set in stone, not subject to any modification whatsoever.  However, Ms. Page's deposition testimony indicates that may not actually have been true. As mentioned, Ms. Page testified that that the GMHBC position had been considered as a possible reasonable accommodation for plaintiff in the spring of 2017, around the time that the barista position was offered to plaintiff.  ECF 50-4 at 6, Page Dep. at 48-49.  Of pertinence here, Ms. Page testified that some of the requirements of the GMHBC position, such as lifting heavy objects, could have been "waiv[ed]."  *Id.* at 6, Page Dep. at 49.  Yet, plaintiff was never informed of this.

It is not clear from the sparse excerpts of the deposition transcript that have been submitted whether Ms. Page was questioned further about which job requirements could have been modified or whether the job requirements of other positions could have been modified.  But, the testimony that has been provided implies that some of the requirements of the relevant positions could have been adjusted to accommodate plaintiff, and thus, that if plaintiff had been informed that the requirements were subject to modification, she and Ms. Page could have worked together to land on a reasonable accommodation.

Accordingly, I conclude that this record contains genuine issues of material fact and that Safeway has failed to carry its burden at this juncture.  My task is simply to determine whether any triable issue exists.  That said, certain facts cannot escape notice.  By now, five years have passed since the interactive process began.  Plaintiff twice rejected offers to transfer to other

positions.  And, since she ceased working at Safeway during 2016, it appears that plaintiff has not attempted to procure other gainful employment.   Nevertheless, based on the submissions, defendant is not entitled to summary judgment.

### IV.  Conclusion

For the foregoing reasons, I shall deny the Motion.

An Order follows.

Date: June 4, 2021                                                    /s/
                                                         Ellen L. Hollander
                                                         United States District Judge